IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

ENTERED
MAY 2 9 2003
SAMUEL L. KAY, CLERK
U.S. District & Bankruptcy Courts
Southern District of West Virginia

IVS HYDRO, INC., a West Virginia corporation,
and GENERAL MANAGEMENT SERVICES, INC.,
a West Virginia corporation,

                Plaintiffs,

v.                          CIVIL ACTION NO. 2:01-1296

JACKIE RAY ROBINSON, ONYX INDUSTRIAL
SERVICES, INC., a Delaware corporation, and ONYX
PRECISION SERVICES, INC., a Delaware corporation,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the court are the motion of the defendants, Jackie Ray Robinson (Robinson), Onyx Industrial Services, Inc., and Onyx Precision Services, Inc. (collectively, Onyx) for summary judgment on all counts [Docket 147] and the motion of the plaintiffs, IVS Hydro, Inc. (IVS) and General Management Services, Inc. (GMS), for partial summary judgment on Counts Two, Five and Eight [Docket 149]. For the reasons discussed below, the defendants' motion is **GRANTED** as to all counts and the plaintiffs' motion is **DENIED**.

**I.**      **Facts**

IVS and Onyx are competing members in an industry that provides vacuuming, water blasting, and chemical cleaning services to power and chemical plants in the mid-Ohio valley. Each solicits the other's customers, and any customer account that either receives is non-exclusive. The plants may call upon several competitors in the course of any given year and may receive services

-2-

from multiple providers. In addition, IVS and Onyx both compete for skilled employees who have established relationships with customers. IVS employed defendant Robinson as a field worker in high pressure water blasting from 1977 to 1985, and then as a salesman and superintendent of industrial operations from September 1992 until Robinson submitted his resignation on September 28, 2001. On October 1, 2001, Robinson went to work for Onyx performing substantially the same job he had been performing at IVS. It is the circumstances surrounding Robinson's and other IVS employees' move from IVS to Onyx in October 2001 that brings this case before the court.

IVS hires its employees on an at-will basis. Employees are free to resign at any time and IVS has the right to discharge its employees at any time and for any lawful reason. At the time it hired Robinson, IVS did not require its employees to sign employment agreements or confidentiality agreements.[1] In 2000, Fred Clark became general manager of the company after his step-father, Ken Davis, retired from the position. Clark instituted an aggressive expansion effort, and by the summer of 2001, many IVS employees were unhappy with controversial changes in the company's management style. Rumors flew among the workers that Clark was running the company in a way that it could not succeed. Many IVS employees also had difficulty in their personal dealings with Clark, causing several to begin to look elsewhere for new employment opportunities.

By late summer of 2001, Robinson and fellow IVS employees Ken Eddy, Steven Hicks, Marty McBrayer, and Fred Cline were investigating alternative employment. In early September 2001, Robinson approached Eddy after an IVS manager's meeting and told Eddy that he, Hicks, McBrayer, and Cline were displeased with Clark's leadership and were looking for work somewhere

---

[1] Since the events of this case, IVS has instituted a confidentiality agreement that it requires its employees to sign.

else. Eddy answered that he knew people at Onyx, and would give those people a call. Two days later, Eddy called Daniel Wright, Vice President of Onyx, to tell Wright about the employees' interest in leaving IVS. Later that week, Eddy called Wright again and set up a lunch meeting for a few days later in Wheelersburg, Ohio. Present at that lunch meeting were Eddy, Wright, and Cline. During lunch, Eddy and Cline told Wright that they, along with some other men, wanted to leave IVS and that they were looking for a company for which to work. Wright asked whether the men had signed non-compete agreements with IVS (to which Eddy and Cline answered no), told Eddy and Cline that he would like to talk to all the interested people, and that Onyx might consider hiring them.

Eddy and Wright then arranged for a second meeting at Eddy's farm in Belpre, Ohio on September 6, 2001. Present at that meeting were Wright, Eddy, Robinson, Cline, Hicks, and Ronald Burdette, area manager for Onyx's Vienna, West Virginia facility. The men discussed: (1) their unhappiness with the situation at IVS, (2) current customers that they were servicing as IVS employees, and (3) the fact that if the men were to go to work at Onyx, Onyx could perhaps take some of the IVS's business. Wright and Burdette also again confirmed that none of the men had signed non-compete agreements with IVS. Robinson also told Wright and Burdette a general, rough figure of the price rates for his line of work in the Ohio valley. Specifically, Robinson stated: "I didn't want to give them rates because I didn't know I was going to work for them. I told them the going rate on a vac truck was $95 per hour. The going rate on a 10K unit was like $76." (Def.'s Exh. 23 at 21). Wright ultimately sent written offers of employment to Cline, Eddy, Hicks, McBrayer, and Robinson on September 10, 2001.

-3-

On September 17, 2001, the men, absent Burdette and with the addition of Tim Marshall of Onyx, met again at a restaurant in Gallipolis, Ohio to discuss the IVS employees' questions about their offers (i.e., employee benefits and insurance coverage). On September 18, 2001, Cline and Eddy resigned from IVS. In mid-September 2001, Burdette, Wright, and Connie Johnson, a member of Onyx's human resources department, participated in a conference call with Cline, Eddy, Hicks, McBrayer, and Robinson so that Johnson could answer questions about Onyx's benefit package. On September 24, 2001, Wright sent a second offer of employment to Robinson, articulating some changes that Robinson had requested. Robinson, Hicks, and McBrayer resigned from IVS on September 28, 2001. That same day, after learning that Hicks, McBrayer, and Robinson had all resigned, many of the IVS hourly employees called Hicks at home to find out why he had left IVS. Hicks in turn called several IVS hourly employees about possibly coming to work for Onyx. One hourly employee, John Bills, stated that either Hicks or Ryan Garrison, another IVS employee, asked him (Bills) to call certain IVS employees from an IVS employee phone list to encourage them to go to Onyx's Vienna, West Virginia facility on October 1, 2001 to find out about working for Onyx.

On September 29, 2001, Cline, Eddy, Hicks, McBrayer, and Robinson met with Burdette and Wright to pick up Onyx company vehicles, and the former IVS men stated that many IVS hourly employees who had been working under their supervision may want to come to Onyx also. On October 1, 2001, Cline, Eddy, Hicks, McBrayer, Robinson, and at least nineteen[2] other IVS hourly employees arrived at Onyx's Vienna facility. At least two of these men, Bills and Ronald Delancy,

---

[2] These men included James Allison, Anthony Bailey, Charles Bailey, Richard Bennett, Steven Cline, Ryan Garrison, Christopher Hall, Clay Hearn, Lester Hughart, Jason Melrose, Jason Moneypenny, Randy Moneypenny, Chad Place, Mark Stanley, Harry Steele, Charles Tullius, Chad West, Ronald Delancy, and John Bills.

-4-

decided not to transfer to Onyx and instead stayed at IVS. As instructed by Wright, none of the men brought any IVS information or any documents that belonged to IVS with them. On October 2001, Robinson submitted blanket order bids to the following customers whose accounts he had been personally responsible for while at IVS: Solvay Advance Polymers (formerly BP/Amoco), American Municipal Power (AMP), Allegheny Power, and Kraton Polymer. Onyx was awarded this work and is still performing services for these companies.

The plaintiffs filed suit against Robinson and Onyx on December 19, 2001, alleging various instances of wrongdoing by the defendants, including: (1) civil conspiracy, (2) wrongful inducement of its employees to resign, (3) defamation, (4) breach of fiduciary duty, (5) violations of the Uniform Trade Secrets Act (UTSA), W. Va. Code § 47-22-1, *et seq.*, (6) conspiracy in restraint of trade,[3] (7) interference with prospective business advantage,[4] (8) tortious interference with contract, and (9) fraud. The case is now presented to the court on the defendants' motion for summary judgment on all counts, and on the plaintiffs' motion for summary judgment on Counts Two, Five and Eight.

## II. Discussion

### A. Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most

---

[3] The court dismissed this count by order dated May 16, 2002.

[4] It appears to the court that the plaintiffs have abandoned this claim.

favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### B.    Count Two: Wrongful Inducement of Employees to Resign

Count Two of the plaintiffs' complaint alleges that defendant Robinson "recklessly, negligently, intentionally, willfully and with malice" solicited IVS employees to resign. To establish a *prima facie* case of tortious interference with contract, a plaintiff must prove: "(1) the existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages." *C. W. Dev., Inc. v. Structures, Inc.*, 408 S.E.2d 41, 44 (W. Va. 1991).

West Virginia law does not require an employee to have an employment contract for a cause of action for tortious interference to be actionable. In *Thacker Coal & Coke Co. v. Burke*, 53 S.E. 161 (1906), the West Virginia Supreme Court stated that "if one wantonly and maliciously, whether for his own benefit or not, induces a person to violate his contract with a third person to the injury of that third person, it is actionable." *Id.* at 162 (quotation omitted). In this case, both parties

acknowledge that IVS hired its employees on an at-will basis - none had employment contracts for any specified length of time. However, the at-will nature of the employment in this case is not dispositive of IVS's claim for tortious interference, for as the *Thacker* court went on to state:

> [t]o make out the relation of master and servant, it is not necessary that there be any written, or even verbal, contract between the parties to work for any particular length of time . . . . Employers, where third parties interfere with their employees, against the latter's consent, and endeavor by unlawful means to induce them to quit work, have a right to sue for relief.

*Id.* at 163-64 (quotation omitted).

On the other hand, there is a correlation between the nature of the employment relationship and the strength of a claim for tortious interference. As one district court of the Eastern District of Virginia has noted, "[w]hile interference with such a [terminable-at-will] contract may provide the basis of an action for tortious interference, 'the extent of permissible third-party interference increases as the degree of enforceability of a business relationship decreases.'" *Artist v. Virginia Int'l Terminals, Inc.*, 679 F. Supp. 587, 595 (E. D. Va. 1988), *aff'd*, 857 F.2d 977 (4th Cir. 1988) (quoting *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987)). This principle supports the general rule that "[t]he mere fact that a competitor or someone acting in his behalf induces an employee to leave his employer and to become employed by his competitor . . . [does] not . . . make the competitor or the person acting in his behalf liable in any way to the employer, where the employee was not engaged for a definite term." S. R. Shapiro, Annotation, *Liability for Inducing Employee Not Engaged for Definite Term to Move to Competitor*, 24 A.L.R.3d 821, § 3 (2002). Thus, it appears that the defendants' solicitation of IVS employees to come work for it is not *per se* actionable.

Even if the court were to give the plaintiffs the benefit of the doubt and consider the defendants' solicitation of IVS at-will employees an actionable act of interference, the plaintiffs'

claim in Count Two still fails because the plaintiffs cannot prove a causal link between the damages they complain of and the defendants' acts. Plaintiffs point to no evidence that they lost business accounts because of insufficient personnel. Further, the plaintiffs admit in deposition testimony that IVS did not suffer any lost revenue due to the departure of IVS employees to Onyx. Plaintiffs contend that $84,000 IVS paid out in loyalty bonuses to its remaining employees to encourage them to stay is a loss attributable to the defendants' solicitation. This contention lacks merit. While IVS made a business decision to pay its remaining employees a bonus, there is no indication that these payments were damages caused by the defendants. In fact, employees who received the bonuses stated that the payments would not have been required to keep them on board at IVS, and Clark himself stated that no employee demanded or even asked for a bonus. Because the plaintiffs have failed to offer evidence of damages attributable to the defendants' solicitation of its employees, the court **GRANTS** the defendants' motion and **DENIES** the plaintiffs' motion for summary judgment as to Count Two.

### C.    Count Three: Defamation

Count Three alleges that Robinson, acting as an agent of Onyx, made misrepresentations and false statements defaming IVS's business and its officers. Specifically, the alleged statements are that: (1) Clark was stealing money from IVS; (2) the plaintiffs were unable to pay their creditors and were in poor financial condition; and (3) the plaintiffs would likely be out of business by January 1, 2002. To prove a *prima facie* case of defamation, a plaintiff must show: (1) defamatory statements were made; (2) a nonprivileged communication to a third party occurred; (3) the statements were false; (4) the statements were made in reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury. *Crump v. Beckley Newspaper, Inc.*

320 S.E.2d 70, 77 (W. Va. 1983). A statement is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id* (quotation and citations omitted). The truth of the alleged defamatory statement is an absolute defense to liability. *Id.* at 79.

The circumstances surrounding the first statement are as follows: Tarra Desmond, office manager for IVS, stated in an affidavit that she overheard Robinson tell Kenneth Davis, Clark's stepfather and president of IVS prior to Clark, that Clark had "destroyed in three years what it took [Davis] thirty years to build;" that Clark was a "terrible manager, no one could get along with him or liked him;" and that Clark "managed to bankrupt his chicken restaurant, his law firm, [and] now he was working on IVS." (Pl. Exh. 7 at 3). While these statements may qualify as defamatory, the plaintiffs can point to no evidence showing that Robinson's critical statements of Clark to Clark's step-father caused it to lose business or employees or otherwise caused harm to the plaintiffs.[5]

Robinson admits making the remaining statements about IVS's financial condition, or at least statements to a similar effect.[6] These statements also fail as actionable defamatory statements. While the plaintiffs can show that several IVS employees heard Robinson's statements regarding IVS's financial condition, and even that the employees may have left IVS because of what Robinson said, IVS does not offer any evidence that the company suffered any financial damages as a result of Robinson's words (i.e., IVS cannot attribute any lost customers to the fact that it suddenly had less

---

[5] Clark himself is not an individual party to this suit.

[6] *See* Robinson's Response to Plaintiffs' Interrogatories, Requests for Production of Documents, and Requests for Admission ("Robinson admits that, on at least one occasion, he stated that 'Fred Clark would probably bankrupt IVS;' . . . [and] that 'IVS was late in paying its trade creditors.'").

-9-

employees).[7] Moreover, IVS has not provided the testimony of a single customer who attests to have heard any of Robinson's defamatory statements. There is no evidence offered of a causal link between any alleged rumor that the company was in financial trouble and the customers IVS claims to have lost. The court **GRANTS** the defendants' motion for summary judgment on Count Three.

### D.    Count Four:   Breach of Fiduciary Duty

Count Four charges defendant Robinson with breach of a fiduciary duty to IVS requiring him to act with "utmost good faith, fair dealing, honesty, candor, loyalty and diligence." To prove a breach of fiduciary duty, a plaintiff must show: (1) the existence of the fiduciary relationship, (2) a breach of that duty, and (3) damages proximately caused by the breach. *Affiliated Constr. Trades Found. v. Vieweg*, 520 S.E.2d 854, 869 (W. Va. 1999). In this case, the critical determination is whether or not Robinson actually owed a fiduciary duty to IVS. "The fiduciary duty is '[a] duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person. It is the highest standard of duty implied by law[.]'" *Elmore v. State Farm Mut. Auto. Ins. Co.*, 504 S.E.2d 893, 898 (W. Va. 1998) (quoting *Black's Law Dictionary* 625 (6th ed. 1990)). The critical factor in the employment context is whether or not the employee occupies a position of trust and confidence. *See Chelsea Indus., Inc. v. Gaffney*, 449 N.E.2d 320, 326 (Mass. 1983) (employee occupying a position of trust and confidence is bound to act for employer's benefit in all matters within scope of employment); *Maryland Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1978) ("[A] *corporate* officer or other *high-echelon* employee is barred from actively competing with his

---

[7] As discussed above, the $84,000 in loyalty bonuses does not qualify as recoverable damages.

employer during the tenure of his employment, even in the absence of an express covenant so providing.") (citations omitted) (emphasis added)).

In this case, the facts do not indicate that Robinson was a "high-echelon employee" such that he would owe the "highest standard of duty imposed by the law" to IVS. Robinson was a salesman hired on an at-will basis whom IVS was free to terminate at any time. The West Virginia Supreme Court has refused to impose on the state a duty of good faith and fair dealing with its at-will employees, because such a duty "would be contrary to the general principles . . . that grant the appointing authority an unfettered right to terminate an appointee." *Wilhelm v. W. Va. Lottery*, 479 S.E.2d 602, 606 (W. Va. 1996) (quotation omitted). While not directly on point, this ruling implies that the at-will status of the employee is important to the determination of whether a fiduciary duty exists. Furthermore, there is no evidence offered in defense of the summary judgment motion that Robinson had a role that would reasonably be considered as giving rise to a fiduciary duty. Clark exercised the managerial control, and it was because of his management style that Robinson left. The court **GRANTS** the defendants' motion for summary judgment on Count Four.

### E.     Count Five: Violation of the Uniform Trade Secrets Act

Count Five alleges that defendant Robinson was responsible for confidential customer lists, contract information, price information, and customer negotiation strategy; that this information is protected as trade secrets under the Uniform Trade Secrets Act (UTSA); and that Robinson's disclosure of the information without the permission of IVS to Onyx caused it to lose accounts to Onyx. In order to make a claim under the UTSA, the plaintiff must prove: (1) the existence of a trade secret; (2) misappropriation of that trade secret; and (3) resulting damages. *W. Va. Code* 47-22-1 (2003). A trade secret is:

> [I]nformation, including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 47-22-1(d). The Restatement defines a trade secret as "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others." *Restatement (Third) of Unfair Competition* § 39 (1995). In determining the existence of a trade secret, the Restatement directs a court to make a comparative evaluation of "the value, secrecy, and definiteness of the information as well as the nature of the defendant's misconduct." *Id.* § 39 cmt. d.

The information Robinson had from his experience at IVS does not qualify as a trade secret. Certainly, the pricing information used to create bids is highly valuable to those in this competitive industry. However, in *Voorhees v. Guyan Machinery Co.*, 446 S.E.2d 672 (W. Va. 1994), the West Virginia Supreme Court refused to find that an employee's "knowledge of product prices, customer lists, customer reorder lists . . . and company profit margins constituted a protectible employer interest." *Id.* at 677. As one district court has stated, "[p]ricing and estimating is a matter of experience, knowledge of the business, and judgment. The factors to be considered in making estimates are fundamental - inside costs, outside costs, overhead, and profit. The amount of money making up each factor necessarily fluctuates with the market. There is nothing secret in the decision of how much of a mark-up percentage is necessary for a good profit." *CarpetMaster of Latham, Ltd. v. Dupont Flooring Sys., Inc.*, 12 F. Supp. 2d 257, 262 (N.D.N.Y. 1998) (citation omitted). The evidence in opposition to summary judgment suggests that this is the only type of information that Robinson had and may have taken with him.

In addition, IVS's efforts to maintain the secrecy of its information do not rise to the level necessary to qualify the information as a trade secret. IVS never had its employees sign confidentiality agreements promising not to disclose the pricing information they had learned. There is evidence that IVS's pricing information was kept in unlocked offices in folders not marked as confidential, and that every employee with access to the company's computer system had access to the pricing information. The defendants also point out that while some bids containing pricing information were marked as confidential, the practice was not consistently followed.

Furthermore, in evaluating the nature of the defendants' conduct, the court does not believe that Robinson's actions were either unethical or illegal. IVS can provide no evidence that Robinson took any documents with him, and has no evidence that Robinson "misappropriated" anything. Any misconduct on Robinson's part was minor, and does not tip the balance in favor of finding the existence of a trade secret. Robinson saw an employment opportunity in which he might get away from his personal problems with IVS's president and where he might earn more money. The defendants' motion for summary judgment is **GRANTED** and the plaintiffs' motion for summary judgment is **DENIED** as to Count Five.

F.     **Count Nine: Fraud**

Count Nine alleges that defendant Robinson committed fraud by leading the plaintiffs to believe he was undertaking his job responsibilities "in furtherance of the best economic interests of the plaintiffs," but that Robinson actually acted in direct conflict to the plaintiffs' interests. The plaintiffs do not point to any specific fraudulent statements by Robinson, but instead indicate that several of Robinson's acts qualify as material omissions or concealments. Specifically, the plaintiffs refer (1) to Robinson's meetings with Onyx agents in August and September 2001, at which time

IVS alleges Robinson revealed IVS's rates to Onyx, and (2) to a golf outing attended by Robinson and BP/Amoco officials (paid for by IVS), at which IVS alleges Robinson discussed obtaining BP/Amoco's business for another competing firm that Robinson was considering buying. Importantly, however, the plaintiffs fail to provide any citation to the record in their response to the defendants' summary judgment motion to support these allegations of fraud.

In order to make a successful claim for fraud, a plaintiff must prove: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that the act was material and false, and that the plaintiff relied on the act and was justified under the circumstances to rely, and (3) that the plaintiff suffered damages as a result. *Capitol Chrysler-Plymouth, Inc. v. Megginson*, 532 S.E.2d 43, 46 (W. Va. 2000). Fraud includes "all acts, omissions, and concealments which involve a breach of legal duty, trust or confidence justly reposed, and which are injurious to another, or by which undue and unconsciousness advantage is taken of another." *Kessel v. Leavitt*, 511 S.E.2d 720, 752 (W. Va. 1998) (quotation and citation omitted). As stated above, the court has found that Robinson did not owe a fiduciary duty to IVS because he was not a high-level employee to whom such trust is imposed. Furthermore, Robinson was under no legal obligation to IVS as he never signed a confidentiality agreement and did not have a contract of employment. The court does not see how any of the alleged fraudulent acts were false or untrue, and IVS has failed to prove that it relied on statements made by Robinson to its detriment. Therefore, the court **GRANTS** the defendants' motion for summary judgment on Count Nine.

### G. Count Eight: Tortious Interference with Contract

Count Eight alleges that defendant Robinson, while still employed by IVS, acted as an agent of Onyx in an effort to solicit business away from IVS. Specifically, Count Eight states that

Robinson, in conjunction with Onyx, intentionally undertook to disrupt plaintiffs' contracts and business relationships with its customers, and that the defendants' actions proximately caused the loss of those business relationships. As stated above in part II.B, the elements of a *prima facie* case of tortious interference are: "(1) the existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages." *C. W. Dev.*, 408 S.E.2d at 44.

The fact that two parties are in legitimate competition with one another is a defense under West Virginia law to a claim of tortious interference. *Kessel v. Leavitt*, 511 S.E.2d 720, 763 (W. Va. 1998) It is not improper interference with another's existing terminable-at-will contract if "(a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other." *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 314 S.E.2d 166, 172 (W. Va. 1983) (quoting *Restatement (Second) of Torts* § 768 (1979)). In this case, the defendants easily meet the first, third and fourth elements of a competition defense. It is evident that IVS and Onyx are fierce, direct competitors in their industry, and the quality of each company's employee base directly relates to that competition. There is no implication of a trade restraint issue on these facts, and it appears from the parties' recitation of the facts that the employee solicitation was performed so that Onyx could gain a competitive advantage over IVS.

The one element of the defendants' competition defense that requires discussion is the second element - whether Robinson and Onyx employed wrongful means in their competitive tactics. The

court has not found any West Virginia case law that outlines a precise definition of "wrongful means." After analyzing relevant case law from other jurisdictions, the court predicts that the West Virginia Supreme Court would find, and this court therefore finds, that the term "wrongful means" encompasses tortious or illegal acts, including violations of statutes, regulations, or recognized common-law rules. *See, e.g., DP-TEK, Inc. v. AT & T Global Info. Solutions* Co., 100 F.3d 828, 833 (10th Cir. 1996) ("[I]n a claim for interference with a prospective contract, wrongful means requires independently actionable conduct."). This definition requires an inquiry into the competitive tactics used by the defendants, and necessarily implicates the remaining causes of action in the plaintiffs' complaint. The acts alleged in Counts Three, Four, Five, and Nine (defamation, breach of fiduciary duty, violation of the Uniform Trade Secrets Act, and fraud) would qualify as "wrongful means" if proven, and would negate any defense of legitimate competition that Onyx might have. However, as discussed above, the court has found no validity to these causes of action, and does not find any other evidence of acts constituting "wrongful means." Thus, it appears that Onyx has a valid defense of competition to counter IVS's claim that Onyx tortiously interfered with its business relationships, and the court therefore **GRANTS** the defendants' motion and **DENIES** the plaintiffs' motion for summary judgment as to Count Eight.

### H. Count One: Civil Conspiracy

Count One alleges that the defendants conspired to: (1) wrongfully induce the plaintiffs' employees to resign, (2) defame the plaintiffs, (3) commit fraud, (4) breach fiduciary obligations, (5) violate the UTSA, (6) restrain trade, and (7) interfere with existing and prospective business advantages. "A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful

means. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff." *Kessel*, 511 S.E.2d at 754 (W. Va. 1998). Thus, to prove a claim for civil conspiracy, a plaintiff must prove the underlying tort-based liability first. As the court has found the defendants not liable to the plaintiffs on the plaintiffs' preceding tort claims, the court **GRANTS** the defendants' motion for summary judgment as to Count One.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: May 29, 2003

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE